## ASSET PURCHASE AND SALE AGREEMENT

**THIS ASSET PURCHASE AND SALE AGREEMENT** ("Agreement"), is made and entered into as of the 3rd day of December, 2019, by and between Filtration Services Group, LLC, a Delaware limited liability company (the "Seller"), and Filtration Systems Products, Inc., a Missouri corporation (the "Purchaser," and together with the Seller, the "Parties," and each, a "Party").

## BACKGROUND:

**WHEREAS**, Seller provides filtration management products and filtration services for manufacturing and industrial business operations, including automotive, petrochemical, paint and coatings, cabinet finishing, door finishing, and window finishing throughout North America (the "Business");

**WHEREAS**, on August 13, 2019, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court"), case no. 19-51724-mbm ("Bankruptcy Case"); and

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, substantially all of the assets owned by Seller pursuant to the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the promises hereinafter made, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the recital provisions above are incorporated into the body of this Agreement as if fully set forth therein, and the Parties agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

**1.01    Purchased Assets**. At the Closing (as defined below), Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to all of the assets of Seller (the "Purchased Assets"), including, but not limited to, those assets that are described on the attached Schedule 1.01, free and clear of any and all liens, claims, and  encumbrances, pursuant to a sale authorized by the Bankruptcy Court under 11 U.S.C. § 363 of the Bankruptcy Code. Notwithstanding the foregoing, the Purchased Assets shall not include the Excluded Assets (as defined herein).

**1.02    No Representations and Warranties.**  Except in each instance for and with respect to the representations and warranties of Seller in Article IV of this Agreement, Purchaser acknowledges and agrees that (i) it is acquiring the Purchased Assets on an "**AS-IS, WHERE IS**" basis, (ii) Seller has made no express or implied representations or warranties to Purchaser regarding the Purchased Assets or the Business, including any representations or warranties of merchantability, fitness for any particular purpose or use, or title, and that all representations and

warranties other than those expressly set forth in Article IV are expressly disclaimed by Seller, (iii) Purchaser has performed its own due diligence on the Purchased Assets and Business and is relying solely on the representations and warranties set forth in Article IV and the results of Purchaser's investigations, examinations and inspections of the Purchased Assets and the Business, and (iv) Purchaser has not been induced by any statements or representations of Seller or any agent or representative of Seller with respect to the condition or quality of the Purchased Assets.

      **1.03   Excluded Assets.** The Parties acknowledge and agree that the Purchased Assets shall not include: (a) any cash on hand or deposits of Seller; (b) any employee benefit plans of Seller; (c) any causes of action arising under Chapter 5 of the Bankruptcy Code; (d) any of Seller's contracts, and any rights under Seller's contracts, that are not specifically assumed and assigned under 11 U.S.C. § 365 of the Bankruptcy Code; (e) Seller's tax returns, minute books and corporate governance documents; (f) Seller's insurance policies and any claims existing as of the Closing thereunder; (g) claims against Seller's officer, directors, managers, members, or other insiders; and (h) all membership interests of Seller and its members (collectively, "Excluded Assets").

## ARTICLE II

## LIABILITIES

      **2.01   Assumed Liabilities**. Subject to Section 2.02(i), At the Closing, Purchaser shall assume and agree to perform and discharge all Liabilities (as hereinafter defined) which first accrue and are to be performed from and after the Closing under the Assumed Contracts (as hereinafter defined, the "Assumed Liabilities").

      **2.02   Excluded Liabilities**. Except for the Assumed Liabilities, Purchaser shall not assume or be responsible for any debts, Liabilities, obligations or commitments of Seller or the Business whatsoever, whether actual, absolute, accrued, fixed, contingent, asserted or unasserted, known or unknown, and whether related or unrelated to the Purchased Assets. For the avoidance of doubt, Purchaser shall not assume, nor shall Purchaser be responsible for, (i) any Liabilities arising out of or relating to the Assumed Contracts before the Closing, including any Liabilities that relate to or arise from any pre-Closing breach of contract, breach of warranty, tortious conduct, environmental matter, infringement, or violation of any federal, state, local and foreign laws, statutes, codes, rules, regulations, ordinances, judgments, orders, decrees and the like of any governmental authority, including common law (collectively, "Laws"); (ii) any Liability attributable to or arising from the ownership or operation of the Purchased Assets or the Business prior to the Closing; (iii) for any pending or threatened litigation, third-party claims, unfunded pension Liabilities, taxes, fees or other charges, tort Liabilities, warranty Liabilities, environmental Liabilities, criminal claims, worker's compensation Liabilities, or any Liabilities arising or otherwise incurred by Seller prior to or after the Closing; or (iv) any of Seller's taxes. All such Liabilities and obligations, fixed or contingent, known or unknown, are and shall remain the Liabilities and obligations of Seller. For purposes of this Agreement, the term "Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability or obligation for taxes.

**2.03**    **Assignment of Contracts.** Subject to Section 2.02 above, Seller will assign and transfer to Purchaser each of the contracts listed on Schedule 2.03 (the "Assumed Contracts") at the Closing, which Schedule 2.03 Purchaser may amend or modify in its sole discretion at any time before the Closing.   Notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, (a) to the extent that Seller's rights under any Assumed Contract may not be assigned to Purchaser without the consent of another person or entity, and (b) such consent has not been obtained before the Closing, this Agreement will constitute an agreement to assign such Assumed Contract from Seller to Purchaser, and Purchaser will be deemed to have assumed such contract.

## ARTICLE III

## PURCHASE PRICE AND CLOSING

**3.01.    Purchase Price**. For purposes of this Agreement, the term "Purchase Price" means (a) $1,600,000, <u>plus</u> (b) the Estimated Inventory and Accounts Receivable Adjustment (as defined herein); provided that, in no event will the Purchase Price be greater than $1,600,000, including as a result of any adjustment under this Section 3.01 or Section 3.03.   For purposes of this Agreement, the "Estimated Inventory and Accounts Receivable Adjustment" means the amount equal to (i) the Estimated Inventory and Accounts Receivable Value, <u>minus</u> (ii) $1,450,000. For purposes of this Agreement, the "Estimated Inventory and Accounts Receivable Value" means a written statement developed jointly by Seller and Purchaser in good faith setting forth the Parties' estimate of the Inventory and Accounts Receivable Value (as defined herein).

**3.02    Payment of the Purchase Price**.  The Purchase Price shall be paid at the Closing as follows:

(a)    $100,000 by delivery to Fifth Third Bank (the "Escrow Agent") by wire transfer of immediately available funds to an account designated in an escrow agreement ("Escrow Agreement") entered into between the Escrow Agent, Seller, and Purchaser, which amount will be held and disbursed by the Escrow Agent in accordance with this Agreement and the Escrow Agreement; and

(b)    the balance payable to Seller by wire transfer of immediately available funds to an account designated by Seller.

**3.03    Purchase Price Adjustment.**

(a)    At least five business days before the Closing, Seller will deliver the Estimated Inventory and Accounts Receivable Value to Purchaser.

(b)    Within 30 days following the Closing Date, Purchaser will prepare and deliver to Seller a report setting forth in reasonable detail Purchaser's computation of the Inventory and Accounts Receivable Value ("Adjustment Report").

(c)    Within 10 days after receipt of the Adjustment Report ("Objection Period"), Seller, by written notice to Purchaser, may object to the Inventory and Accounts

Receivable Value as set forth in the Adjustment Report, setting forth in such notice ("Objection Notice") Seller's objection in reasonable detail and Seller's proposal or proposals with respect to the calculation of the Inventory and Accounts Receivable Value ("Disputed Items"). During the 10 days immediately following Seller's receipt of the Adjustment Report, Seller will have reasonable and customary access to the working papers relating to the Adjustment Report and such other books and records and access to the personnel of Seller and Purchaser as is reasonable under the circumstances. Within 30 days following timely delivery of the Objection Notice, Purchaser and Seller will attempt, in good faith, to resolve all Disputed Items. If Purchaser and Seller cannot resolve the Disputed Items within such 30-day period, then all such Disputed Items will be submitted for resolution to Doeren Mayhew (the "Independent Auditor"). Promptly, but not later than 20 days after the Disputed Items have been submitted to the Independent Auditor, the Independent Auditor will determine (based solely on presentations by Seller and Purchaser and not by independent review) only the Disputed Items and will render its report as to its resolution of such terms and resulting calculations of the Inventory and Accounts Receivable Value. In determining each Disputed Item, the Independent Auditor may not assign a value to such item greater than the greatest value for such item claimed by either Party or less than the lowest value for such term claimed by either Party. For the purposes of the Independent Auditor's calculation of the Inventory and Accounts Receivable Value, the amounts to be included will be the appropriate amounts from the Adjustment Report as to items that are not in dispute, and the amounts determined by the Independent Auditor as to the Disputed Items. Seller and Purchaser will cooperate with the Independent Auditor in making its determination and such determination will be reasoned, in writing, and conclusive and binding upon the Parties and a judgment may be entered upon any such determination in any court of competent jurisdiction. The costs and fees of the Independent Auditor related to such determination by the Independent Auditor, including the costs relating to any negotiations with the Independent Auditor with respect to the terms and conditions of such Independent Auditor's engagement, will be paid by Purchaser and Seller on an inversely proportional basis, based upon the relative portions of the Disputed Items that have been submitted to the Independent Auditor for resolution that ultimately are awarded in favor of Purchaser and Seller, as the case may be, (e.g., if $100,000 is in dispute, and of that amount the Independent Auditor awards $75,000 in favor of Purchaser and $25,000 in favor of Seller, then Purchaser will be responsible for 25%, and Seller 75%, of the costs and fees of the Independent Auditor).

(d)     If Seller does not deliver an Objection Notice during the Objection Period, then Seller will be deemed to have accepted the calculation of the Inventory and Accounts Receivable Value as set forth in the Adjustment Report. The term "Final Inventory and Accounts Receivable Value" will mean (i) the Inventory and Accounts Receivable Value as set forth in the Adjustment Report if Seller accepts the Adjustment Report as delivered or does not deliver an Objection Notice during the Objection Period, or (ii) the Inventory and Accounts Receivable Value determined under Section 3.03(c) above if Seller delivers an Objection Notice during the Objection Period.

(e)     If the Final Inventory and Accounts Receivable Value is less than the Estimated Inventory and Accounts Receivable Value, then the entire difference between

the Final Inventory and Accounts Receivable Value and the Estimated Inventory and Accounts Receivable Value will be payable by Seller to Purchaser (i) by the Escrow Agent from the Escrow Amount held in the Escrow Account, and (ii) by Seller if there is a balance, in each instance under (i) and (ii) above by wire transfer of immediately available funds to the account(s) specified by Purchaser, to be paid to Purchaser within five business days after the Final Inventory and Accounts Receivable Value is determined.

(f)      If the Final Inventory and Accounts Receivable Value is greater than the Estimated Inventory and Accounts Receivable Value, then the entire difference between the Final Inventory and Accounts Receivable Value and the Estimated Inventory and Accounts Receivable Value will be payable by the Escrow Agent from the Escrow Amount held in the Escrow Account by wire transfer of immediately available funds to the account(s) specified by Seller, to be paid to Seller within five business days after the Final Inventory and Accounts Receivable Value is determined.  For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, (i) Purchaser will have no Liability for any amounts owing under this Section 3.03; and (ii) Seller's sole recourse for any amounts owing to Seller under this Section 3.03 will be from the Escrow Amount held in the Escrow Account.

(g)      Each Party will treat all payments made under this Section 3.03 as adjustments of the Purchase Price for all purposes.

(h)      For purposes of this Agreement, the term "Inventory and Accounts Receivable Value" means (1) the good and merchantable finished goods inventory that is not subject to any reserves or allowances of Seller as of the Closing Date (but without taking into account the transactions described in this Agreement), as determined in accordance with generally accepted accounting principles consistently applied ("GAAP"), plus (2) the valid, current, bona fide, and collectible accounts receivable that is not subject to any reserves or allowances of Seller as of the Closing Date (but without taking into account the transactions described in this Agreement), as determined in accordance with GAAP, in each instance using the methodology used for purposes of Exhibit 3.03(h).  Nothing in Section 3.03 or elsewhere in this Agreement will permit (or will be deemed or construed as permitting) the Parties or the Independent Auditor to: (x) include or introduce any balance sheet line items or accounts that are different from those included in Exhibit 3.03(h); or (y) make any changes or modifications to the accounting principles used for the purposes of, and in the calculations set forth on, Exhibit 3.03(h), or otherwise introduce or use any accounting principles, policies, practices, and assumptions, procedures, elections, categorizations, or methods (including those relating to the nature of accounts and inclusion of balance sheet line items and the level of reserves and/or accruals, any calculations or estimations thereof, or any adjustments thereto) that are different from the accounting principles used for the purposes of, and in the calculations set forth on, Exhibit 3.03(h).

**3.04    The Closing**.  The closing of the transaction contemplated by this Agreement (the "Closing") shall take place on December 31, 2019 or on such other date as Seller and Purchaser may mutually agree upon in writing.  The date on which the Closing occurs is herein referred to as the "Closing Date." The Closing may take place via emailed PDF signatures.  The Closing shall be effective as of 11:59 p.m., Detroit, Michigan time on the Closing Date.

**3.05    Actions at the Closing**.  At the Closing, the Seller and Purchaser shall deliver to each other the various certificates, instruments and documents as specified in Article VII below.

**3.06    Purchase Price Allocation**.    The Purchase Price shall be allocated to the Purchased Assets for all purposes in the manner required under Internal Revenue Code Section 1060 and agreed to by Purchaser and Seller in good faith ("**Purchase Price Allocation**"), with the agreed upon Purchase Price Allocation to be set forth on Schedule 3.06.  In the event that, after the Purchase Price Allocation is determined, the Purchase Price is adjusted, the Purchase Price Allocation will also be adjusted in a mutually agreed upon manner.  Purchaser and Seller will file all tax returns (including amended returns and claims for refunds) in a manner consistent with the Purchase Price Allocation, including any adjustments to such Purchase Price Allocation made pursuant to this Section 3.06, and will use their reasonable best efforts to sustain such allocation in any subsequent tax audit or dispute.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and as of the Closing Date, subject in each case to the disclosures and exceptions set forth in the disclosure schedules (but only to the extent that the disclosure schedules are arranged in paragraphs corresponding to the section numbers contained in Article IV) to be delivered pursuant to Section 6.02(i) and to be attached hereto, Seller hereby represents and warrants to Purchaser as follows:

**4.01    Organization; Power and Authority**.  Seller is a limited liability company duly organized and validly existing under the Laws of the State of Delaware and is duly qualified to do business and in good standing under the Laws all other jurisdictions in which its ownership or use of property for the conduct of its business requires it to qualify except where the failure to be so qualified would not have a material adverse effect on the Business or the Purchased Assets. Seller has all necessary power and authority to own all of its properties and assets, to conduct its business as now being conducted, and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

**4.02    Execution, Delivery and Validity**.  Subject to an order of the Bankruptcy Court approving the transactions contemplated by this Agreement in accordance with the Bankruptcy Code having been entered by the Bankruptcy Court and having become final and nonappealable, the execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, by Seller has been duly authorized, and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of

equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**4.03    Non-contravention**.  Except as set forth on Section 4.03, the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby or thereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby or thereby, do not and will not (i) conflict with or result in a breach of any of the provisions of the Articles of Organization and Operating Agreement of Seller; or (ii) conflict with, result in a breach of, constitute a default under, or give rise to a right of termination under any Assumed Contract, or require the approval or consent of any customer or third party with respect to any Assumed Contract.

**4.04    Contracts and Commitments**.  Except as disclosed on Schedule 4.04, with respect to the Assumed Contracts (i) each of the Assumed Contracts is in full force and effect, except to the extent that enforceability may be limited by bankruptcy, insolvency, fraudulent transfer and other laws affecting the enforcement of creditors' right generally and by general principles of equity, (ii) Seller has performed in all material respects all of its obligations required to be performed by it under each Assumed Contract that is an executory contract, (iii) other than a breach or default caused by commencing the Bankruptcy Case, neither Seller nor, to Seller's actual knowledge, any other party is in material breach or default under any Assumed Contract, (iv) Seller has no contracts with any shareholder of Seller which may not be terminated immediately upon notice by Purchaser following the Closing, without cost or penalty; and (v) each of the Assumed Contracts is assignable and an assignment of any Assumed Contract will not be an event of default under the terms of the Assumed Contract.   Seller has furnished to Purchaser a true and correct copy of all written Assumed Contracts and other items that are described or required to be described on Schedule 2.03.

**4.05    Personal Property**.  With respect to the Purchased Assets that are owned by Seller, immediately following the Closing no person, firm or corporation other than Purchaser shall have any right to the use or possession of such Purchased Assets.

**4.06    Employees and Agreements Relating to Employment.**

(a)    There is no written employment contract with any employees, independent contractors or consultants of the Seller.

(b)    There is not pending or, to Seller's knowledge, threatened in writing any action or other formal claim or investigation against Seller for any actual or alleged violation of any employment contract or for violation of any right or obligation under any employment contract.

(c)    There is no collective bargaining agreement, and no union has been certified or has sought recognition as a bargaining agent for any employee of Seller.

(d)    Seller has complied in all material respects with all applicable Laws relating to the employment of personnel and labor and employee benefit plans.

**4.07    Compliance with Laws**. Seller has not received any written notice of any civil,

criminal or administrative investigation or audit by any governmental entity relating to Seller or the Business. To Seller's knowledge, it has complied with, and is in compliance with, all applicable Laws, except where the failure to comply would not have a material adverse effect on the Business or the Purchased Assets.

**4.08    Broker's or Finder's Fee.**  Seller has not employed, nor is Seller liable for the payment of any fee to, any finder, broker, consultant or similar person or entity in connection with the transactions contemplated by this Agreement.

**4.09    Seller's Operation of Business**.  Except for the filing of the Bankruptcy Case, Seller has operated the Business in the ordinary course of business up to the Closing, and has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, other than inventory sold for a fair consideration in the ordinary course of business.  For purposes of this Agreement, the phrase "ordinary course of business" means, with respect to Seller, in the ordinary course of Seller's business consistent with past practice, including as to the quantity, quality, and frequency.

**4.10    Leased Real Property**.  Schedule 4.10 sets forth the address of each parcel of real property that Seller leases, and a true and complete list of all leases for each such real property.  Seller has delivered to Purchaser a true and complete copy of each such lease document.  Seller's possession and quiet enjoyment of the real property under such leases has not been disturbed and there are no disputes with respect to such leases.  Except as disclosed on Schedule 4.10, neither Seller nor any other party to any lease is in breach or default under such lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification, or acceleration of rent under any lease other than the commencement of the Bankruptcy Case.  Seller has not subleased, licensed, or otherwise granted any person or entity the right to use or occupy any real property leased by Seller or any portion thereof.

**4.11    Tax Matters**.  (a) Seller has duly and timely filed all tax returns that it was required to file, (b) no claim has ever been made by a taxing authority in a jurisdiction where Seller does not file tax returns that it is or may be subject to taxation by that jurisdiction, and (c) Seller has withheld and paid (or set aside in an account for such purpose) all taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, former employee, partner, independent contractor, creditor, stockholder, affiliate, customer, supplier, or other third party.

**4.12    Assets.**  Seller owns or leases, free and clear of liens, claims and encumbrances, all of the Purchased Assets, other than the rights of lessors under leases and liens in favor of the Seller's lender, and any other liens or encumbrances which will be released and discharged pursuant to order of the Bankruptcy Court.  In the aggregate, the Purchased Assets are sufficient to operate the business as presently conducted.  Each tangible asset included in the Purchased Assets that is material to the Business is in reasonably good working condition (subject to normal wear and tear), and is suitable for the purposes for which it presently is used.

**4.13    [Reserved]**

**4.14    Inventory.**  Except as disclosed on Schedule 4.14, Seller's inventory, including, without limitation, all raw materials, work-in-process, finished goods inventories of Seller, consists of a quality and quantity usable and saleable in the ordinary course of business consistent with past practice.  In the aggregate, Seller's inventory is sufficient to operate the business as presently conducted.

**4.15    Product Liability.**  There are no Liabilities of Seller resulting from or under (a) any warranty made or allegedly made before the Closing by Seller with respect to any product it manufactures, distributes, uses or installs or any services it renders, (b) any alleged defect in, non-performance or deficiency of any nature in any of the foregoing manufactured and sold before the Closing, or (c) any injury to person or property caused to any degree by any of the foregoing manufactured and sold before the Closing.

**4.16    Customers and Suppliers.**  Schedule 4.16 lists each of (a) the customers of Seller whose purchases in the past year have exceeded 10% of the total sales of Seller for that period, and (b) the suppliers of Seller whose goods and/or services supplied in the past year have exceeded 10% of the total cost of goods of Seller for that period.  Except as set forth on Schedule 4.16, (A) no supplier listed in Schedule 4.16 has stopped or materially decreased or threatened in writing to stop or materially decrease the rate of supplying materials, products, or services to Seller, and (B) no customer listed on Schedule 4.16 has stopped or materially decreased or threatened in writing to stop, or materially decrease the rate of, purchasing materials, products, or services from Seller.

**4.17    Litigation.**  Schedule 4.17 lists all actions and proceedings to which Seller is or was a party that currently is pending, was settled, or adjudicated within the past three years, was settled and adjudicated more than three years ago, but with respect to which Seller has unsatisfied Liabilities, or that, to the knowledge of Seller, are threatened.

**4.18    Accounts Receivable**.  Except as disclosed on Schedule 4.18, all accounts receivable of Seller are reflected properly on the books and records of Seller, arose solely out of bona fide sales and deliveries of goods, performance of services, and other business transactions in the ordinary course of business, are valid receivables subject to no setoffs or counterclaims, and, to Seller's knowledge, are collectible.

**4.19    Environmental Matters**.  Seller has complied with, and is in compliance with, all Laws related to environmental and safety requirements, in all material respects.  None of the following exists or existed at any property leased by Seller: (a) underground storage tanks, (b) asbestos or asbestos-containing materials, (c) materials or equipment containing polychlorinated biphenyls, or (d) landfills, surface impoundments, or disposal areas.  Seller has not received any written notice that it treated, stored, disposed of, arranged for, or permitted the disposal of, transported, handled, or released any substance, or owned or operated any property or facility in a manner that has given rise to or, to Seller's knowledge, would give rise to any Liability.

**4.20    Independent Auditor**.  Seller has not been a client of the Independent Auditor or has had any material relationship with the Independent Auditor during the last five years.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and as of the Closing Date, Purchaser hereby represents and warrants to Seller as follows:

**5.01    Organization**.  Purchaser is a corporation duly organized and validly existing under the laws of the State of Missouri.  Purchaser has all necessary power and authority to own all of its property and assets and to make, execute, deliver, and perform this Agreement and the other documents and instruments contemplated hereby.

**5.02    Execution, Delivery and Validity**.  The execution, delivery and performance of this Agreement by Purchaser have been duly authorized by all requisite corporate action.  This Agreement and all other agreements contemplated hereby have been duly and validly executed and delivered by Purchaser, and each constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**5.03    Non-contravention**.  The execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby or thereby or compliance with or fulfillment of the terms and provisions hereof or of any other agreement or instrument contemplated hereby or thereby, do not and will not: (i) conflict with or result in a breach of any of the provisions of the Articles of Incorporation or By-Laws of Purchaser; (ii) contravene any law, rule or regulation or any order, writ, award, judgment, decree or other determination which affects or binds Purchaser; (iii) conflict with, result in a breach of, constitute a default under, or give rise to a right of acceleration, termination or the imposition of penalties under any contract, deed of trust, mortgage, trust, lease, governmental or other license, permit or other authorization, contract, agreement, note or any other agreement, instrument or restriction to which Purchaser is a party; or (iv) require the approval, consent or authorization of, or the making of any declaration, filing or registration with, any third party or any foreign, federal, state or local court, governmental authority or regulatory body.

**5.04    Broker's or Finder's Fee**.  Purchaser has not employed, nor is Purchaser liable for the payment of any fee to any finder, broker, consultant or similar person in connection with the transactions contemplated by this Agreement.

**5.05    Independent Auditor**.  Purchaser has not been a client of the Independent Auditor or has had any material relationship with the Independent Auditor during the last five years.

**ARTICLE VI**

**RELATED AGREEMENTS AND CONDITIONS TO CLOSING**

  **6.01** **Related Agreements**.  In addition to any other agreements contemplated hereby or herein:

    (a) <u>Employees</u>.  Effective as of Closing, Seller will (without any liability to Purchaser) take such action as may be required to terminate Seller's employment of each employee to be hired by Purchaser (in Purchaser's sole discretion).  Seller shall pay to each employee (whether or not hired by Purchaser) all wages and other benefits owed by Seller as of the Closing on or before Seller's first regularly scheduled payroll period following the Closing.  As of the Closing, Purchaser may offer employment to some or all of those employees of Seller who are employed by the Seller as of the Closing, including employees who are absent due to vacation, illness, family leave, short-term disability or other approved leaves of absence.  Any such offer of employment which may be made by Purchaser shall be on an employment at-will basis.

    (b) <u>Retention of and Access to Files and Records Following the Closing Date</u>. In the event that some of the Seller's records concerning the Purchased Assets cannot reasonably be segregated from the records of the Seller not being transferred pursuant to this Agreement, Seller shall not deliver such records to Purchaser but shall maintain, preserve and safely keep such records for as long as may be required by applicable Law and in accordance with customary business practices.  Seller shall permit the Purchaser or Purchaser's employees and representatives, at reasonable times and at the Purchaser's expense, to inspect, make extracts from or copies of such records which relate to any such records.

    (c) <u>Further Assurances</u>.  Following the Closing, Seller shall from time to time without unreasonable delay and for no additional consideration, execute and deliver such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by Purchaser, to confirm and assure the rights and obligations provided for in this Agreement and render effective the consummation of the transactions contemplated hereby, including immediately remitting to Purchaser any cash or property received by Seller after the Closing in respect of the Purchased Assets (such as payments made with respect to the inventory and accounts receivable included in the Purchased Assets).

    (d) <u>Operation and Maintenance of the Business</u>.  From the date of this Agreement until the Closing, Seller will conduct its business in the ordinary course of business consistent in all material respects with past practice, subject to any restrictions and limitations placed by the Bankruptcy Court or the Bankruptcy Code. From the date hereof until the Closing, except as otherwise contemplated by this Agreement or consented to in writing by Purchaser, Seller will not: (i) issue, sell or deliver interests of Seller's membership interests or issue or sell any securities convertible into, or options with respect to, or warrants to purchase or rights to subscribe for, any shares of Seller's membership interests; (ii) effect any recapitalization, reclassification, stock dividend,

stock split or like change in Seller's capitalization; (iii) amend Seller's certificate of formation or operating agreement (or equivalent governing documents); (iv) permit, allow or suffer any of Seller's assets to become subjected to any lien, claim or encumbrance of any nature whatsoever; (v) make any change in any method of accounting or accounting practice or policy; (vi) acquire by merging or consolidating with, or by purchasing any of the assets of, or by any other manner, any person, entity or division thereof or otherwise acquire any assets (other than inventory in the ordinary course of business) that are material; (vii) make any capital expenditure commitments which, in the aggregate, exceed $5,000 or are outside the ordinary course of business; (viii) sell, lease, license or otherwise dispose of any of Seller's assets except inventory and obsolete or excess equipment sold or retired in the ordinary course of business; (ix) enter into any lease of real property, except any renewals of existing leases in the ordinary course of business; (x) change Seller's historical practice with respect to payment of accounts payable or collection of accounts receivable; (xi) institute, settle or agree to settle any litigation, investigation, action, proceeding, or other claim by any governmental authority or any person or entity; (xii) enter into, modify or terminate any of the Assumed Contracts; (xiii) agree or otherwise commit, whether in writing or otherwise, to do, or take any action or omit to take any action that would result in, any of the foregoing.

(e)     <u>Information and Access</u>.  From time to time at Purchaser's request upon reasonable notice and at reasonable times through the Closing, Seller will provide to representatives of Purchaser and their financing parties and each of their agents, employees and accounting, tax, legal, and other advisors (collectively, "<u>Investigating Parties</u>"): (a) full access to the premises or properties of Seller; (b) access to all accounts, insurance policies, tax returns, and tax records, contracts, and other books and records concerning Seller, and the Business and operations and such other relevant information and materials as may be reasonably requested; and (c) the opportunity to discuss the affairs, finances, and accounts of Seller, with officers, management employees, sales representatives, and present and former independent accountants of Seller that would reasonably be presumed to have information which would be relevant for the purposes of conducting Purchaser's and such other Investigating Parties' business, accounting, financial, environmental, legal, and other due diligence review regarding the assets of Seller and the Business and preparing for the financing and consummation of the transactions described in this Agreement and the conduct of the Business and operation thereafter, in each case so long as such access does not unreasonably interfere with the Business.  From the date of this Agreement until the Closing or the earlier termination of this Agreement, Seller will cooperate with the Investigating Parties in arranging for interviews of suppliers and customers of Seller as reasonably requested by Purchaser.

(f)     <u>Commercially Reasonable Efforts</u>.  Each Party will use commercially reasonable efforts to cause the conditions to Purchaser's and Seller's respective obligations to consummate the transactions described in this Agreement to be satisfied. Promptly after Seller obtains knowledge thereof, but in all events before the Closing, Seller will inform Purchaser of any fact or circumstance which, if it existed on the Closing Date, would constitute a breach of any representation or warranty of Seller set forth in this Agreement or any breach of any covenant or agreement of Seller set forth in

this Agreement, or any threatened or instituted action or proceeding.

(g)     Maintenance of Real Property.  Seller will (a) maintain any leased real property in substantially the same condition as of the date of this Agreement, ordinary wear and tear excepted; (b) refrain from transferring any leased real property or permitting any easements, liens, mortgages, encumbrances, or other interests that would affect any leased real property or Seller's ability to comply with the terms of this Agreement; and (c) keep in effect public liability and hazardous and extended coverage insurance for any leased real property comparable to that presently in effect. Without the prior written consent of Purchaser, Seller will not permit any of Seller's leases for real property to be amended, modified, extended, renewed, or terminated (other than by the terms of the lease), nor will Seller enter into any new lease for the use or occupancy of any real property, without the prior written consent of Purchaser.

(h)     Break-Up Fee.  If all or substantially all of the Purchase Assets are sold, whether under Section 363 or 365 of the Bankruptcy Code, under a confirmed plan of reorganization, or otherwise, in a single transaction or a series of transactions to one or more persons or entities other than Purchaser or an affiliate of Purchaser, then Purchaser will receive, without further order of the Bankruptcy Court, from the proceeds of the sale, an amount in cash equal to the sum of $50,000 ("Break-Up Fee").  Such Break-Up Fee will be made by wire transfer of immediately available funds to an account designated by Purchaser from the proceeds of the sale within five business days of the sale.  This Section 6.01(h) will survive any termination or expiration of this Agreement. Each of the Parties acknowledges that the agreements contained in this Section 6.01(h) are an integral part of the transactions contemplated by this Agreement and that the Break-Up Fee is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchaser in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by his Agreement, which amount would otherwise be impossible to calculate with precision.

**6.02    Conditions to Obligations of Purchaser**.  All obligations of Purchaser under this Agreement are subject to the fulfillment, at or prior to the Closing, of the following conditions, any one or more of which may be waived by Purchaser:

(a)     Representations and Warranties.  All representations and warranties of Seller contained in or made pursuant to this Agreement shall be true and correct on and as of the Closing as though made on and as of the Closing, and Seller shall have delivered to Purchaser a certificate, signed and dated as of the Closing by an officer of Seller to the foregoing effect.

(b)     Performance of Agreement.  Seller shall have delivered all documents and agreements described in Article VII and otherwise performed in all respects all obligations required under this Agreement and any other agreements referenced herein to be performed by it on or prior to the Closing.

(c)     Litigation; Injunctions.  No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby or which would limit or affect Purchaser's ownership or control of the Purchased Assets, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any court or governmental agency or other regulatory or administrative agency or commission challenging any of the transactions contemplated by this Agreement.

(d)     Consents and Approvals.  All consents, approvals, licenses and permits, and lien releases, the granting of which are necessary for the consummation of the transactions contemplated hereby in Purchaser's sole discretion, shall have been obtained, including from General Motors LLC or any of its affiliates or subsidiaries and any other customer in Purchaser's sole discretion.

(e)     Absence of Changes.  On or prior to the Closing, there shall have been no loss, damage or destruction to the Purchased Assets which impairs in any material respect the use or the value of the Purchased Assets and there shall have been no materially adverse change in the Business, its financial condition, or its prospects.

(f)     Corporate Certificates.  Seller shall have delivered to Purchaser: (i) a copy of Seller's Certificate of Formation and Operating Agreement; and (ii) a certificate of good standing of Seller issued as of a date no more than five (5) days prior to the Closing by the Delaware Secretary of State.

(g)     Financing.  The Purchaser shall have obtained sufficient financing to consummate the Closing and to fund working capital requirements on terms and conditions acceptable to Purchaser in its sole discretion.

(h)     Employees.  The select employees of Seller listed on Schedule 6.02(h) will have ceased employment with Seller before the Closing and accepted employment with Purchaser effective as of the Closing on terms and conditions satisfactory to Purchaser.

(i)     Disclosure Schedules.  Seller shall have delivered to Purchaser any schedules to this Agreement as soon as possible after entering into this Agreement, but in any event at least 15 days before the Closing.

(j)     Lease.  Purchaser shall have entered into a real property lease for Seller's Oklahoma City, Oklahoma facility.

**6.03    Conditions to Obligations of Seller.**  All obligations of Seller under this Agreement are subject to the fulfillment, at or prior to the Closing, of the following conditions, any one or more of which may be waived by Seller:

(a)     All representations and warranties of Purchaser contained in or made pursuant to this Agreement shall be true and correct on and as of the Closing with the same force and effect as though made on and as of the Closing, and Purchaser shall have

delivered to Seller a certificate, signed and dated as of the Closing Date by an officer of Purchaser to the foregoing effect.

(b)     All consents, approvals, licenses and permits, and lien releases, the granting of which are necessary for the consummation of the transactions contemplated hereby in Purchaser's sole discretion, shall have been obtained.

**6.04     Conditions to Obligations of Both Parties**. All obligations of the Parties under this Agreement are subject to the fulfillment, prior to the Closing, of the following conditions, which may not be waived by the Parties:

(a)     The entry by the Bankruptcy Court of a final, non-appealable order approving bid procedures naming Purchaser as the stalking horse bidder and containing customary bid protections (including a breakup and/or termination fee, and a minimum overbid) and other protections acceptable to Purchaser ("Bid Procedures Order").

(b)     The entry by the Bankruptcy Court of a final, non-appealable order approving the assumption and assignment of the Assumed Contracts under 11 U.S.C. § 365 of the Bankruptcy Code containing terms and protections acceptable to Purchaser.

(c)     The entry by the Bankruptcy Court of a final, non-appealable order approving this Agreement contains terms and protections acceptable to Purchaser.

(d)     The entry by the Bankruptcy Court of a final, non-appealable order containing findings of fact, conclusions of law, injunctions, and other terms and conditions acceptable to Purchaser from the Bankruptcy Court approving the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances under 11 U.S.C. § 363 of the Bankruptcy Code.

## ARTICLE VII

## DELIVERIES AT CLOSING

**7.01     Deliveries by Seller**. Seller shall execute, acknowledge, deliver and cause to be executed, acknowledged and delivered to Purchaser documents conveying title to the Purchased Assets as follows:

(a)     Seller shall execute and deliver to Purchaser a bill of sale as to all of the Purchased Assets ("Bill of Sale"), in the form attached hereto as Exhibit 7.01(a).

(b)     Seller shall execute an assignment and assumption agreement ("Assignment and Assumption Agreement"), in the form attached hereto as Exhibit 7.01(b) together with such other instruments and specific forms of assignment as may be necessary to effect the transfer and registration of transfer of the Assumed Contracts.

(c)     Seller shall deliver originals (to the extent available, and if not, copies) of the documents in Seller's possession constituting part of or relating to the Purchased Assets.

(d)     Seller shall deliver to Purchaser a certificate executed by Seller as to the accuracy of their representations and warranties as of the Closing in accordance with Article IV and as to their compliance with and performance of their covenants and obligations to be performed or complied with at the Closing in accordance with Section 6.01.

(e)     Seller shall deliver to Purchaser a Certificate of Non-Foreign Status required under Section 1445 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

(g)     Purchaser shall have received a signed copy of an amendment to Seller's Certificate of Formation revoking Seller's name filing for "Filtration Services Group, LLC" and any derivative thereof, ready for filing with the appropriate governmental entity immediately following the Closing accompanied by a letter from Seller authorizing Purchaser to make such filing following the Closing

**7.02    Deliveries by Purchaser**. Purchaser shall execute, acknowledge, deliver and cause to be executed, acknowledged and delivered to Seller the following items:

(a)     The Purchase Price in the manner provided in Section 3.02.

(b)     The Bill of Sale.

(c)     The Assignment and Assumption Agreement.

**7.03    Additionally Requested Documents; Post-Closing Assistance**.    At the reasonable request of Purchaser at Closing and at any time or from time to time thereafter, Seller shall cooperate with Purchaser to put Purchaser in actual possession and operating control of the Purchased Assets, execute and deliver such further instruments of sale, conveyance, transfer and assignment as Purchaser may reasonably request in order to effectively convey, transfer and assign the same to Purchaser, free and clear of all liens.

## ARTICLE VIII

## SURVIVAL OF PROVISIONS; INDEMNIFICATION

**8.01    Survival**.  The respective representations, warranties and covenants of each of the Parties to this Agreement, including all statements contained in any schedule or exhibit delivered pursuant hereto, shall expire as of the Closing.

**8.02    [Reserved]**

**8.03    Tax Matters**.  Seller agrees to obtain any certificate or other document from any governmental authority or any other person or entity as may be necessary to mitigate, reduce, or eliminate any tax that could be imposed on Purchaser or become a lien, claim, or encumbrance on the Purchased Assets by reason of, or with respect to, the transactions described in this Agreement.  Without limiting the foregoing, Seller will make (and cooperate with Purchaser in the making of) any and all filings required to be relieved of (and to relieve Purchaser from) any

sales, use, transfer, documentary, stamp, withholding or similar tax otherwise applicable to the contemplated transactions, including application for a tax clearance certificate ("Tax Clearance Certificate") from any taxing or other governmental authority. All sales, use, transfer, real property transfer, filing, recording, stock transfer, stamp, stamp duty reserve, value added, documentary, and other similar taxes and all conveyance fees, recording charges, and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions described in this Agreement will be paid by Seller when due, and Seller will, at its own expense, file all necessary tax returns and other documentation with respect to all such taxes, fees, and charges.

## ARTICLE IX

## MISCELLANEOUS

**9.01 Termination.** This Agreement may be terminated at any time prior to Closing: (a) by the mutual written consent of the Parties hereto; (b) by Purchaser in the event that the conditions to its obligations set forth in Section 6.02 hereof have not been satisfied or waived at or prior to the Closing; (c) by Seller in the event that the conditions to its obligations set forth in Section 6.03 hereof have not been satisfied or waived at or prior to the Closing; (d) by either Party if the Bid Procedures Order is not entered by November 26, 2019; (e) by either Party if the Closing has not occurred by December 31, 2019, or if Seller sells any of the Purchased Assets to another party, or if Seller accepts a competing bid for the Purchased Assets; (f) by Purchaser, by written notice to Seller, at any time if Purchaser is not satisfied, in its sole discretion, with Purchaser's due diligence investigation of Seller; (g) by Purchaser, by written notice to Seller, at any time if Purchaser, in its sole discretion, cannot obtain on terms and conditions satisfactory to it all of the financing it needs to consummate the Closing of the transactions contemplated by this Agreement and to fund working capital requirements after the Closing; (h) by Purchaser upon written notice to Seller if Seller has breached or breaches any material provision of this Agreement; or (i) by Purchaser upon written notice to Seller if the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, if the Bankruptcy Case is dismissed, or if a trustee is appointed in this Bankruptcy Case, or if any party seeks any of the foregoing, whether through formal motion or otherwise. In the event this Agreement is terminated pursuant to this Section, all rights and obligations of the Parties hereunder shall terminate and no Party shall have any Liability to any other Party; provided that the obligations of the Parties described in Sections 6.01(h), 9.06, 9.12 and 9.14 will survive any such termination.

**9.02 Risk of Loss.** Seller assumes all risks of destruction, loss or damage to any of the Purchased Assets due to fire or other casualty up to and including the Closing. If any material portion of the Purchased Assets is so destroyed, lost or damaged prior to Closing as to impair Purchaser's ability to operate the Business, as determined in Purchaser's discretion, Purchaser shall have the right to terminate this Agreement. Purchaser assumes all such risks of destruction, loss or damage after Closing.

**9.03 Assignment.** Seller may not assign any rights or delegate any obligations under this Agreement without the prior written consent of Purchaser, and any prohibited assignment or delegation will be null and void. The Parties hereby acknowledge and agree that Purchaser may assign this Agreement at any time prior to Closing to any affiliated third party assignee, provided

that such assignee agrees to assume Purchaser's obligations hereunder. Purchaser's assignment of this Agreement shall not relieve Purchaser of any of its duties and obligations under this Agreement.

**9.04    Other Expenses**.  Except as otherwise expressly provided for in this Agreement, Seller shall pay all of its expenses incurred in connection with the negotiation, execution, and implementation of the transactions contemplated under this Agreement, and Purchaser shall pay all of its expenses incurred in connection with the negotiation, execution, and implementation of the transactions contemplated under this Agreement.

**9.05    Notices**.  All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given: (a) if delivered personally, on the date received, (b) if delivered by overnight courier, on the day after mailing, (c) if mailed by first class certified mail, return receipt requested and with postage prepaid, upon receipt or refusal to accept receipt, and (d) if emailed, on the date of transmission (with confirmation of receipt).  If mailed pursuant to Section 9.05(c), a courtesy copy via facsimile or email shall also be provided.  Any such notice shall be sent as follows:

To Seller:

Filtration Services Group, LLC
c/o Robert Jackson
5600 Williams Lake Road, Suite E
Waterford, MI 48329

with a copy to:

William C. Blasses
Kerr, Russell and Weber, PLC
500 Woodward Ave. Suite 2500
Detroit, Michigan 48226
Fax: (313) 961-0388
Email: wblasses@kerr-russell.com

To Purchaser:

Filtration Systems Products, Inc.
c/o Robin L. Vance
8506 Herrington Ct.
Pevely, MO 63070
Fax: (314) 721-4519

with a copy to:

Thomas J. Kelly
Wolfson Bolton PLLC
3150 Livernois, Suite 275
Troy, MI 48083
Fax: (248) 247-7099
Email: tkelly@wolfsonbolton.com

**9.06    Controlling Law; Jurisdiction**.  This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Michigan, without giving effect to principles of conflicts of laws.  In the event Purchaser brings suit to enforce the terms of this Agreement, Purchaser and Seller expressly consent to exclusive personal jurisdiction and venue of any such suit in the federal and state courts of the State of Michigan.  In the event Seller brings suit to enforce the terms of this Agreement, Seller and Purchaser expressly and irrevocably consent to exclusive personal jurisdiction and venue of any such suit in the federal and state courts of the State of Michigan.

**9.07    Headings**.  Any table of contents and paragraph headings in this Agreement are

for convenience of reference only and shall not be considered or referred to in resolving questions of interpretation.

**9.08    Benefit**.  This Agreement shall be binding upon and shall inure to the exclusive benefit of the Parties hereto and their respective legal representatives, permitted successors and permitted assigns. This Agreement is not intended to, nor shall it, create any rights in any other party.

**9.09    Partial Invalidity**.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**9.10    Waiver**.   Neither the failure nor any delay on the part of any Party hereto in exercising any rights, power or remedy hereunder shall operate as a waiver thereof, or of any other right, power or remedy; nor shall any single or partial exercise of any right, power or remedy preclude any further or other exercise thereof, or the exercise of any other right, power or remedy. No waiver of any of the provisions of this Agreement shall be effective unless it is in writing and signed by the Party against which it is sought to be enforced and expresses an intention to so modify this Agreement.  No course of dealing between or among any persons or entities having any interest in this Agreement will be deemed effective to modify, amend, or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.  No failure by any Party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof will constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

**9.11    Counterparts and Facsimiles**.  This Agreement may be executed simultaneously in two or more counterparts each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  The signature page to this Agreement and all other documents required to be executed at Closing may be delivered by facsimile and the signatures thereon shall be deemed effective upon receipt by the intended receiving Party.

**9.12    Legal Fees and Costs**.  In the event any Party hereto incurs legal expenses to enforce any provision of this Agreement on account of a breach by the other Party, the prevailing Party will be entitled to recover such legal expenses, including, without limitation, attorneys' fees, costs and disbursements, in addition to any other relief to which such Party shall be entitled.

**9.13    Entire Agreement**.  This Agreement, including the schedules and exhibits hereto, constitutes the entire agreement between the Parties hereto with regard to the matters contained herein and it is understood and agreed that all previous undertakings, negotiations, letter of intent, term sheets, and agreements between the Parties are merged herein. This Agreement may not be modified orally, but only by an agreement in writing signed by Purchaser and Seller.

**9.14    Waiver  of  Jury  Trial**.    **AS  A  SPECIFICALLY  BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY  EXPRESSLY  WAIVES  THE  RIGHT  TO  TRIAL  BY  JURY  IN  ANY**

**PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.**

**9.15    Interpretation.**    The terms "hereof," "herein" and "hereunder" and terms of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement.   Section, clause, Exhibit, and Schedule references contained in this Agreement are references to Sections, clauses, Exhibits, and Schedules in or attached to this Agreement, unless otherwise specified.   All Schedules and Exhibits attached or referred to in this Agreement are hereby incorporated in and made a part of this Agreement as if set forth in full in this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.   Each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form.   As used in this Agreement, the terms "knowledge" or "aware" includes the knowledge and awareness of the person or entity (which, if not an individual, will include the knowledge and awareness of the shareholders, officers, managers, members, and directors of such person or entity, and with respect to Seller, will include the knowledge and awareness of Robert Jackson), and the knowledge and awareness that such person or entity could have obtained after making a reasonably comprehensive inquiry and exercising reasonable diligence with respect to the matter in question.   Each reference in this Agreement to any Law will be deemed to include such Law as it hereafter may be amended, supplemented or modified from time to time and any successor thereto, unless such treatment would be contrary to the express terms of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the date or dates indicated below, effective as of the date first above written.

**SELLER**

**FILTRATION SERVICES GROUP, LLC**, a Delaware limited liability company

By: _____
Name: Robert Jackson
Title: Manager and President


**PURCHASER**

**FILTRATION SYSTEMS PRODUCTS, INC.**, a Missouri corporation

By: _____
Name: Robin L. Vance
Title: President

**Schedule 1.01**
**Purchased Assets**

The Purchased Assets shall include the following:

a)  Any and all security deposits for the Waterford, Michigan property existing on the date of Closing.

b)  Any and all security deposits for the Oklahoma City, Oklahoma property existing on the date of Closing.

c)  Any and all credits and prepayments for purchase of inventory, furniture, and equipment from Filtration Services Group Norspec existing on the date of Closing.

d)  Any and all credits and prepaid expenses reflected on Seller's balance sheet on the date of Closing.

e)  Any and all accounts receivable and other payments due from customers in respect of goods, products and services, existing on the day of Closing as reflected in the books and accounting records of Seller.

f)  [Reserved]

g)  Any and all miscellaneous finished goods existing on the date of Closing.

h)  Any and all miscellaneous supplies existing on the date of Closing.

i)  Any and all miscellaneous office furniture existing on the date of Closing.

j)  Any and all computers existing on the date of Closing.

k)  Any and all miscellaneous computer equipment existing on the date of Closing.

l)  Any and all miscellaneous office equipment including, but not limited to, warehouse storage racking, blanket cutter, and particle counter, existing on the date of Closing.

m) That certain 2000 Chevy Van, VIN No. 1GCGG29U261113673.

n)  That certain 2006 Box Truck, VIN No. 1GBJG31U361126671.

o)  That certain 2008 GMC Sierra Truck, VIN No. 2GTEK133681166325.

p)  That certain 2014 Chevy Cruze, VIN No. unknown.

q)  That certain 2018 GMC Tahoe, VIN No. unknown.

r)  That certain filter recycling intellectual property.

s) All of the tools, machinery, and equipment owned by Seller.

t) All of the furniture and fixtures owned by Seller.

u) All of the inventory owned by Seller, including, without limitation, all raw materials, work-in-process, finished goods, parts, accessories and supplies inventories of Seller.

v) All of the vehicles and other rolling stock owned by Seller.

w) All of Seller's rights under the Assumed Contracts.

x) All of Seller's franchises, licenses and permits.

y) All of Seller's files, records, books and supplier, customer and contacts lists but excluding Seller's tax returns.

z) All of Seller's goodwill.

aa) All of Seller's rights with respect to intellectual property and proprietary rights.

bb) All of Seller's accounts and notes receivable, rights to receive payments, and rights to refunds.

**Schedule 2.03**
**Assumed Contracts**

1. That certain Lease Agreement, between Seller and Don Stelley, for the commercial property located in Oklahoma City, Oklahoma
2. That certain Equipment Lease, between Seller and Wells Fargo Equipment, for the Heli Forklift
3. That certain Agreement, between Seller and GSA Supply, for the supply of filters.
4. Any and all contracts with General Motors LLC and any of its affiliates and subsidiaries
5. Any and all contracts with Caravan Knight and any of its affiliates and subsidiaries
6. Any and all contracts with Flex-N-Gate Corporation and any of its affiliates and subsidiaries
7. Any and all contracts with Leadec and any of its affiliates and subsidiaries
8. Any and all contracts with Volkswagen and any of its affiliates and subsidiaries
9. Any and all contracts with any other customers of Seller

Purchaser may amend or modify the list of Assumed Contracts at any time before Closing.

**Schedule 3.06**
**Purchase Price Allocation**

**Section 4.03**
**Consents**

**Schedule 4.10**
**Leased Real Property**

1. That certain Lease Agreement, between Seller and Don Stelley, for the commercial property located in Oklahoma City, Oklahoma.
2. That certain Lease Agreement, between Seller and Ron and Marilyn Nehring, for the commercial property located in Waterford, Michigan.

**Schedule 4.14**
**Inventory**

**Schedule 4.16**
**Customers and Suppliers**

**Schedule 4.17**
**Litigation**

**Schedule 4.18**
**Accounts Receivable**

**Schedule 6.02(h)**
**Select Employees**

{00087314.DOC 6 }

**EXHIBIT 3.07(h)**
**Estimated Inventory and Accounts Receivable Value**

See attachment.

## EXHIBIT 7.01(a)
## Bill of Sale

See attachment.

# EXHIBIT 7.01(b)
## Assignment and Assumption Agreement

See attachment.